# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | ) | | |
| | ) | Case No. 2:10-cr-0532-RLH-GWF | |
| Plaintiff, | ) | | |
| | ) | **FINDINGS &** | |
| vs. | ) | **RECOMMENDATIONS** | |
| | ) | | |
| OSCAR CARRANZA, | ) | **Motion to Suppress - #19** | |
| | ) | | |
| Defendant. | ) | | |
| _____ | ) | | |

This matter is before the Court on Defendant Oscar Carranza's Motion to Suppress for Fourth Amendment Violation (#19), filed on June 10, 2011; the Government's Response to Defendant's Motion to Suppress (#21), filed on June 24, 2011; and the Defendant's Reply to Government's Response to Defendant's Motion to Suppress (#23), filed on July 23, 2011.  The Court conducted an evidentiary hearing on the motion to suppress on July 19 and 20, 2011. Defendant also filed a Motion to Compel Discovery Pursuant to Brady and Sixth Amendment (#24) on July 8, 2011 and the Government filed a Motion to Quash Subpoena (#30) on July 15, 2011. Oral argument on these motions was heard on July 20, 2011.

The indictment in this case charges Mr. Carranza with three counts of making a false statement during the purchase of a firearm in violation of Title 18 of the United States Code Sections 922(a)(6) and 924(a)(2).  *See Indictment (#1), filed October 26, 2010.*  In particular, the indictment alleges that Mr. Carranza purchased three rifles from the Las Vegas Gun Range and Firearms Center on May 22, 2010 and that Mr. Carranza "knowingly made a false and fictitious written statement to the [seller] . . . that he was the actual transferee/buyer of the firearm[s] when in fact he was acquiring the firearm[s] on behalf of another person."  *Id. pages 1-2.*

1    The indictment is apparently predicated on a "Firearms Transaction Record Part I - Over-

2    the-Counter" form, also known as "ATF Form 4473," that Mr. Carranza was required to complete

3    and sign at the time of the transaction.  The ATF Form 4473 for the transaction charged in the

4    indictment was not introduced during the evidentiary hearing on Defendant's motion to suppress.

5    The Government did, however, introduce the ATF Form 4473 that Mr. Carranza allegedly

6    completed and signed during the purchase of eight assault style rifles from "The Gun Store" on

7    May 16, 2010.  That earlier transaction led to the investigation by Bureau of Alcohol, Tobacco and

8    Firearms ("ATF") agents that resulted in Mr. Carranza's detention on May 22, 2010 following his

9    purchase of three more assault style rifles at the Las Vegas Gun Range and Firearms Center.  ("The

10   Gun Store" and the Las Vegas Gun Range and Firearms Center are two separate businesses.)

11                                    **FACTUAL BACKGROUND**

12   The Government called two witnesses during the evidentiary hearing on Defendant's

13   Motion to Suppress—ATF Special Agent Eric Fox and Las Vegas Metropolitan Police Department

14   Detective Carl Lutjens.  Agent Fox was the lead investigator in regard to Defendant Carranza's

15   firearms purchases.  Detective Lutjens is assigned to the ATF as a task force officer and assisted in

16   the investigation of Mr. Carranza, particularly in regard to the events that occurred on May 22,

17   2010.

18   Agent Fox testified that he has been employed as an ATF agent for just under seven years.

19   He has worked on several investigations involving firearms trafficking and "straw purchase"

20   transactions.  A "straw purchase" involves the purchase a firearm for another person without

21   disclosing that fact to the seller.  Agent Fox has also received training on these matters at the ATF

22   academy.  He testified that persons engaged in the business of selling firearms are required to have

23   a federal license and are required to have firearm buyers complete ATF Form 4473 at the time of

24   purchase.  Section A of this form requires the transferee/buyer to provide his or her full name,

25   current residence address, place of birth whether in the United States or a foreign country, and date

26   of birth.  The form asks several "yes or no" questions, the answers to which may preclude the

27   firearms dealer from selling the firearm to the person.

28   . . .

2

Question 11.a asks:

> Are you the actual transferee/buyer of the firearm(s) listed on this form?  **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person.  If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.** . . . .

*See Government Exhibit 1.*

Questions 11.b-l ask a series of additional questions including whether the transferee/buyer is currently under indictment for a felony or has previously been convicted of a felony, has ever been adjudicated a mental defective or committed to a mental institution, or is an alien illegally in the United States.

Above the line for the transferee's/buyer's signature, ATF Form 4473 states as follows:

> **I certify that my answers to Section A are true, correct and complete.  I have read and understood the Notices, Instructions and Definitions on ATF Form 4473.  I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law.** . . . .

*Id.*

Agent Fox testified that firearms licensees in the Las Vegas area call the local ATF office when they have questions about regulations or laws governing the sale of firearms.  The licensees also call the ATF regarding sales that involve suspicious activity.  The ATF also provides the licensees with information regarding suspicious conduct to look for during firearms transactions.  Agent Fox compared the relationship between the Las Vegas ATF office and the local firearms licensees to a "Neighborhood Watch" program.  He estimated that on average he receives one call per week from firearms licensees involving some question or concern relating to firearms or firearms sales.

Agent Fox testified that on Monday, May 17, 2010 he received a telephone call from an employee of "The Gun Store" regarding a suspicious firearms sale that occurred on Sunday, May 16th.  The employee stated that an individual had purchased eight weapons and had paid in cash.  The employee also stated that the store had tried to contact the ATF on Sunday, but had not been able to reach anyone.  Agent Fox could not recall whether the employee he spoke to was the salesman who sold the firearms or the store manager.  The employee told Agent Fox that the store

1  had made a copy of the surveillance video and the ATF Form 4473 for the transaction.  Agent Fox

2  then went to "The Gun Store" to retrieve the surveillance video and the ATF Form 4473.

3       Upon his arrival at "The Gun Store," Agent Fox was directed to the salesman and the store

4  manager.  They told him that it was suspicious to them that the buyer had paid over $6,000 in cash,

5  mostly in twenty dollar bills, for the firearms.  They stated that such a large cash payment is not

6  normal for their business.  Agent Fox stated that this was significant because the "The Gun Store"

7  is one the highest volume firearms dealers in Las Vegas.  The employees also stated that the eight

8  weapons were all of similar calibers and the buyer did not appear to know much about firearms.

9  The ATF Form 4473 was filled out in the name of Oscar Carranza as the buyer and listed the eight

10 firearms that were purchased.  *Government Exhibit 1.*  Five of the firearms were CAI (Century

11 Arms) manufactured rifles.  Agent Fox described these rifles as similar to a Russian AK 47 assault

12 rifle.  Two of the listed firearms were Stag and Colt manufactured rifles which Agent Fox stated are

13 similar an AR 15 assault weapon used by the United States military.  The eight rifles consisted of

14 only two different calibers.  Agent Fox testified that the rifles are not collector items and are not

15 typically used for hunting.  He indicated, in particular, that the Century Arms rifles are not high

16 quality or particularly expensive rifles.  He stated, however, these types of rifles are in high demand

17 by narcotics traffickers in Mexico and by persons residing in California where the sale of assault

18 rifles is banned.  The ATF Form 4473 also showed that Mr. Carranza purchased two identical

19 Century Arms model number 1975 rifles.  Agent Fox testified that the purchase of identical, non-

20 collector type firearms in the same transaction is also an indicator that the buyer is purchasing the

21 weapons for a third person(s).  Based on his review of the ATF Form 4473, Agent Fox did not

22 believe the purchase was a "normal" firearms sales transaction.

23       "The Gun Store" also provided Agent Fox with a photocopy of Mr. Carranza's Nevada

24 driver's license.  Agent Fox testified that he was familiar with the general neighborhood for the

25 address listed on Mr. Carranza's driver's license.  He stated that the apartment complex in which

26 Mr. Carranza resided was not an economically affluent location and, in his opinion, was not

27 consistent with the $6,000 cash purchase of firearms.  Agent Fox testified that based on his training

28 and experience, illegal firearms purchases are usually conducted in cash, whereas lawful purchases

4

1    are more often made by credit card.  He has, however, seen legitimate cash purchases of firearms.

2    Agent Fox also stated that the fact that Mr. Carranza paid mostly in twenty dollar bills was

3    suspicious for illegal activity.  He acknowledged on cross-examination, however, that he had no

4    information on May 17, 2010 regarding Mr. Carranza's employment or income or whether he had

5    possibly won money gambling which might explain the large cash payment in twenty dollar bills.

6          "The Gun Store" employees told Agent Fox that Mr. Carranza returned to the store on May

7    17, 2010 and inquired about purchasing a Barrett 50 caliber rifle, which is a sniper rifle used by

8    "Special Forces" military units.  It has a range of 2-3 miles.  The rifle costs approximately $10,000

9    and is also in high demand by narcotic traffickers in Mexico.  The employees stated that while Mr.

10   Carranza was inquiring about the Barrett 50 caliber rifle, he was speaking to someone on his cell

11   phone and that he abruptly terminated the inquiry and left the store without purchasing the Barrett

12   rifle.  Agent Fox testified that this information was also suspicious for illegal arms trafficking

13   because straw buyers of firearms may be in telephone contact with the person(s) directing their

14   purchase while it is in progress.

15         Agent Fox testified that given his suspicions regarding the transaction, he believed there

16   might be a tie between Mr. Carranza and "the Southwest border."  He therefore conducted a

17   computer inquiry for border crossings under Mr. Carranza's name.  This inquiry revealed that Mr.

18   Carranza crossed the Mexico-United States border at the Otay Mesa border crossing on March 15

19   and March 17, 2010.  Because of the travel distance between Las Vegas, Nevada and the Otay

20   Mesa border crossing, Agent Fox found it unusual that Mr. Carranza crossed the border on two

21   days in such close proximity to each other.

22         Agent Fox also conducted a query in the Clark County, Nevada data base for handgun

23   registrations and found that Mr. Carranza had no record of handgun registrations in Clark County.

24   He also queried an ATF database that provides information on multiple purchases of handguns

25   anywhere in the United States, but found no record for Mr. Carranza.  These data bases do not

26   provide information on whether an individual has purchased long guns, i.e., rifles or shotguns.  Nor

27   would they reveal whether an individual has purchased and registered single handguns in other

28   states.  Notwithstanding the limitations of these data bases, Agent Fox testified that the absence of

a prior record of handgun ownership by Mr. Carranza was also suspicious in light of his purchase of eight firearms on May 16, 2010.

Agent Fox requested that Detective Lutjens obtain a printout of Mr. Carranza's Nevada driver's license through the Las Vegas Metropolitan Police Department's computer access to Department of Motor Vehicles ("DMV") records. Detective Lutjens obtained the DMV information on May 17, 2010 which showed that Mr. Carranza's Nevada driver's license was issued on June 13, 2008 and expires in August 2012. Agent Fox also requested that an investigator in California conduct a search of that state's DMV records to see if Mr. Carranza had a California driver's license. This inquiry revealed that Mr. Carranza was issued a California driver's license in August 2005, which expired on August 5, 2010. Agent Fox stated that the fact that Mr. Carranza appeared to have both Nevada and California driver's licenses was consistent with his suspicion that Mr. Carranza's purchase of the assault rifles was an illegal "straw purchase." He explained that based on his training and experience, he knows that California residents may illegally purchase assault rifles in Nevada by obtaining a Nevada driver's license to make the purchase appear lawful.[1] Defendant's counsel, however, introduced records that her investigator obtained through a request to the Nevada Department of Motor Vehicles. These records showed that Mr. Carranza surrendered his California driver's license when he applied for his Nevada driver's license on January 5, 2007. Mr. Carranza therefore did not have a California driver's license at the time of the firearms purchase on May 16, 2010 or at the time of the subsequent purchase on May 22, 2010. Due to the limited search of Nevada DMV records that Detective Lutjens performed, however, neither he nor Agent Fox were aware that Mr. Carranza had surrendered his California license.

Agent Fox testified that based on the information he had on May 17, 2010 and thereafter, he decided to place a "flag" on Mr. Carranza with the Nevada Department of Public Safety. ATF Resident Agent in Charge Chittum sent a letter to the Nevada Department of Public Safety on May

---

[1] U.S.C. §922(b)(3) makes it unlawful for a licensed firearms dealer to sell or deliver a firearm to any person whom the dealer knows or has reasonable cause to believe does not reside in the State in which the licensee's place of business is located, unless the sale is conducted in person between the transferor and transferee and complies with the laws of both states.

19, 2010 asking them to notify the ATF if and when Mr. Carranza made another firearms purchase. The letter stated that Mr. Carranza was suspected of trafficking weapons to prohibited persons. *Government Exhibit 5.*  Agent Fox explained the operation of the flag as follows:  When a person seeks to purchase a firearm from a Nevada licensed dealer, the dealer calls the Nevada Department of Public Safety for a background check.  Pursuant to the flag, the Department of Public Safety immediately notifies the ATF of the purchase transaction.  Agent Fox testified that the ATF can also place a "delay" on the flag in which case the Department of Public Safety will notify the firearms dealer that the sales transaction cannot be completed on that day.   A "delay" was not placed on the "flag" for Mr. Carranza.

On May 22, 2010, Agent Fox received a telephone call from the Nevada Department of Public Safety advising that Mr. Carranza was attempting to purchase firearms at the Las Vegas Gun Range and Firearms Center located on Blue Diamond Road in Clark County, Nevada.  Agent Fox telephoned the Las Vegas Gun Range and spoke to the owner or manager, Mike Morrisey.  Agent Fox asked Mr. Morrisey what Mr. Carranza was purchasing, how he was paying and whether he was alone.  Mr. Morrisey stated that Mr. Carranza was purchasing three assault weapons, he was paying in cash and he was not alone. Agent Fox asked whether any of the firearms were Century Arms manufactured weapons.  Mr. Morrisey stated that one of the weapons was a Century Arms rifle.  Agent Fox asked Mr. Morrisey to stall the purchase so that he go to the store before the sale was completed and Mr. Carranza left.

Agent Fox testified that he contacted Detective Lutjens and other agents to assist him. Agent Fox and Detective Lutjens separately drove to the Las Vegas Gun Range and Firearms Center.  The testimony of Agent Fox and Detective Lutjens regarding the events that transpired at the store are consistent.  Detective Lutjens, however, was more precise in his testimony and possibly has a more detailed recollection of what occurred than does Agent Fox.  The following factual summary is therefore primarily based on Detective Lutjens' testimony.  Agent Fox, however, also testified to most of these matters.

Detective Lutjens testified that he received a call from Agent Fox on May 22, 2010 requesting his assistance in investigating Mr. Carranza's purchase of firearms at the Las Vegas Gun

1  Range.  Agent Fox provided Detective Lutjens with the details of the investigation up to that point

2  in time.[2]  Detective Lutjens was the first law enforcement officer to arrive at the store.  He was

3  driving an unmarked vehicle and was dressed in plain clothes, a tee-shirt, shorts and a ball cap.

4  Detective Lutjens notified Agent Fox by cell phone that he had arrived.  He then entered the store

5  and contacted the manager who was located on one side of the store.  The manager directed

6  Detective Lutjens' attention to three individuals at the opposite end of the store as the persons

7  whom Agent Fox had contacted the store about.  The individuals were engaged in conversation

8  with a salesman.  After briefly observing the individuals, Detective Lutjens left the store and called

9  Agent Fox to inform him that the individuals were still in the store.  While waiting for Agent Fox

10 to arrive, Detective Lutjens observed one of the individuals, later identified as Jose Gabriel Herrera,

11 exit the store and get into the passenger side of a Jeep vehicle that was parked to the right of the

12 store's entrance.  Mr. Herrera appeared to recline the seat and rest while waiting for the other

13 individuals to come out of the store.  Detective Lutjens testified that based on his training and

14 experience, Mr. Herrera's conduct in leaving the store before Mr. Carranza was consistent with a

15 "straw purchase" in which the actual buyer is initially present to examine the firearms, but leaves

16 the store before the sales transaction is completed in order not to draw attention to himself.

17     Detective Lutjens testified that a limousine pulled into the parking lot and blocked the

18 vehicle occupied by Mr. Herrera from leaving.  Approximately five minutes after Mr. Herrera

19 exited the store, and just as the limousine was leaving the parking lot, Mr. Carranza and the third

20 individual, subsequently identified as Stuart Yuchasz, exited the store.  Mr. Carranza was carrying

21 what appeared to be three firearms boxes which he placed into the rear compartment of the Jeep.

22 Mr. Carranza and Mr. Yuchasz then got into the Jeep.

23     Agent Fox arrived in the parking lot at about this time.  Agent Fox pulled his unmarked

24 vehicle, which was also a Jeep, in behind Mr. Carranza's vehicle and blocked it from pulling out.

25 No emergency lights or siren were activated on Agent Fox's vehicle. Detective Lutjens and Agent

26 _____

27     [2] A few days earlier, Detective Lutjens had conducted a Nevada DMV records inquiry
regarding Mr. Carranza.  It does not appear from his and Agent Fox's testimony, however, that he

28 was given any details about the investigation at that time.

Fox then approached the driver's side of the vehicle and made contact with Mr. Carranza. Detective Lutjens identified himself as a police officer and asked Mr. Carranza to step out of the vehicle. Mr. Carranza did so and Detective Lutjens escorted him to the sidewalk at the front of his Jeep. Agent Fox, who was also in plain clothes, requested that the other occupants exit the Jeep, which they did, and he also guided them to the sidewalk in front of the store. Neither officer displayed any weapons.

Once all three individuals were at the front of their vehicle, Detective Lutjens conducted a pat-down search of Mr. Carranza and Mr. Herrera for weapons. Agent Fox performed a pat-down of Mr. Yuchasz. Detective Lutjens testified that prior to conducting the pat-down, he informed all three individuals that the pat-down was for safety purposes. He testified that all three individuals gave verbal consent to the pat-downs. No weapons were found on any of the individuals. After completing the pat-downs, Detective Lutjens told the individuals that the officers were conducting a firearms investigation and asked them for identification. Mr. Carranza and Mr. Yuchasz provided their driver's licenses. Mr. Herrera, however, only provided a name to the officers which turned out not to be his true name. Detective Lutjens conducted a records check on all three individuals. Detective Lutjens was able to verify Mr. Carranza's and Mr. Yuchasz's identifications. The name that Mr. Herrera provided, however, did not match any known individual. After obtaining the records check, Detective Lutjens returned the driver's licenses to Mr. Carranza and Mr. Yuchasz.

Detective Lutjens testified that he then advised all three individuals of their *Miranda* rights from a card that he keeps in his possession. All three individuals stated that they understood their rights and agreed to talk to the officers. Detective Lutjens also testified that he told all three individuals that they were not in custody. Agent Fox additionally testified that the individuals were told on multiple occasions that they were not under arrest.

Detective Lutjens testified that he told Mr. Herrera that he could not positively identify him based on the name he had provided. He told Mr. Herrera about the nature of the investigation and stated that the officers' inability to verify his identity was very suspicious. He placed Mr. Herrera in handcuffs, told him that he was not under arrest, but that he would remain in handcuffs until the officers could identify him. Agent Fox also testified that Mr. Herrera was placed in handcuffs as a

1   protective measure because the officers did not know if there were any warrants for his arrest,

2   whether he posed a threat to the officers or whether he might attempt to flee.  At that point, Mr.

3   Herrera requested to speak with the officers away from Mr. Carranza and Mr. Yuchasz.  Detective

4   Lutjens agreed and took Mr. Herrera approximately 10 feet away from the other individuals.  By

5   this time, two other officers, who were also in plain clothes, had arrived at the store.  These officers

6   stood off to the side and observed while Agent Fox and Detective Lutjens dealt with Mr. Herrera,

7   Mr. Carranza and Mr. Yuchesz.

8         Detective Lutjens testified that once Mr. Herrera was away from Mr. Carranza and Mr.

9   Yuchesz, he told Detective Lutjens that he was a "past informant for ICE."  Mr. Herrera gave

10  Detective Lutjens his true name and provided three pieces of written identification which included

11  a Social Security Card, a Department of Homeland Security/U.S. Citizenship and Immigration

12  Employment Authorization card and a "I-94 Departure Record" or "I-94 form."   All three

13  documents were in the name of Jose G. Herrera Acosta.  *Government's Exhibit 6.*  Mr. Herrera also

14  provided the officers with the name and telephone number of his law enforcement "handler"—

15  Immigration and Customs Enforcement ("ICE") Agent Patrick Quigley, who was based in Arizona.

16        Detective Lutjens was able to confirm Mr. Herrera's identity through a Las Vegas

17  Metropolitan Police Department records check.  Detective Lutjens testified that he was not familiar

18  with the "I-94 Departure Record" or "I-94 form" that Mr. Herrera provided to him.  He

19  subsequently learned from an ICE agent that this document permits an alien to cross the border on a

20  daily basis.  The alien's travel, however, is restricted to within 25 miles of the border.  Agent Fox

21  testified that he was familiar with the "I-94 form" permit because he had unsuccessfully sought one

22  for an alien who was assisting the ATF in another investigation.  He acknowledged that these

23  "permits" are difficult to obtain.

24        Agent Fox and Detective Lutjens testified that they did not know Mr. Herrera and had not

25  heard of him prior to May 22, 2010.  They testified that Mr. Herrera was not working for them as a

26  confidential informant in regard to the investigation relating to Mr. Carranza.  Agent Fox testified

27  that after Mr. Herrera informed them that he was a government informant, he and Detective Lutjens

28  were concerned that they may have intruded into another officer's or agency's investigation.

10

1    Detective Lutjens testified that he telephoned ICE Agent Patrick Quigley who stated that Mr.

2    Herrera had assisted ICE in a narcotics trafficking case in the Tucson, Arizona area about a year

3    earlier.  Agent Quigley stated, however, that Mr. Herrera was not working for him on May 22,

4    2010.  Detective Lutjens further testified that Agent Quigley did not provide any information

5    indicating that Mr. Herrera was working as an informant in regard to any illegal firearms trafficking

6    investigations.  After speaking to Agent Quigley, Detective Lutjens removed Mr. Herrera's

7    handcuffs and took him back to stand with Mr. Carranza and Mr. Yuchasz at the front of the store.

8         Agent Fox testified that he also spoke to Agent Quigley on May 22, 2010.  Agent Fox

9    indicated that he told Quigley that the officers were conducting an investigation of Oscar Carranza

10   and had encountered Mr. Herrera during a "Terry stop."  Agent Quigley stated that Mr. Herrera was

11   a government informant under his supervision, but he told Agent Fox that ICE was not conducting

12   an operation in regard to Mr. Carranza and that Mr. Herrera was not working under his direction in

13   regard to any such investigation.  Agent Quigley also stated that Mr. Herrera's "S-Visa" or  "I-94"

14   card restricted him to travel within 25 miles of the United States-Mexico border and Mr. Herrera

15   was therefore not authorized by that visa to be in Las Vegas, Nevada.

16        After verifying Mr. Herrera's identity, Detective Lutjens obtained a consent to search card

17   from his vehicle which he filled out and presented to Mr. Carranza who was the renter of the Jeep.

18   Detective Lutjens testified that he told Mr. Carranza that the officers would like to look inside his

19   vehicle and asked if he would sign the consent to search form "of his own free will."  Mr. Carranza

20   then read the form and signed it.  Detective Lutjens and Agent Fox searched the vehicle and found

21   the three rifles in the back of the vehicle.  Agent Fox stated that Mr. Carranza was present during

22   the search and did not object or revoke his consent to the search at any time.  Agent Fox testified

23   that two of the three rifles found in Mr. Carranza's vehicle were also Century Arms assault type

24   rifles similar to those that Mr. Carranza had purchased on May 16, 2010.  The other rifle was a

25   DPMS model AR-15 assault style rifle.  One of the rifles was also identical to a rifle that Mr.

26   Carranza purchased on May 16, 2010.

27        Agent Fox testified that he asked Mr. Carranza and Mr. Herrera if they would agree to talk

28   to the agents and both individuals stated that they were willing to do so.  Mr. Carranza and Mr.

1    Herrera also stated that they were willing to go to the ATF office to be interviewed.  Agent Fox

2    drove Mr. Carranza to the ATF office in his unmarked vehicle and Detective Lutjens took Mr.

3    Herrera in his vehicle.  The officers apparently decided that it was unnecessary to interview Mr.

4    Yuchasz.  His involvement in the firearms purchases was not explored during the evidentiary

5    hearing.  Mr. Yuchasz  took possession of Mr. Carranza's vehicle with the understanding that Mr.

6    Yuchasz or Mr. Carranza's wife would  pick Mr. Carranza up from the ATF office after his

7    interview was completed.

8         Agent Fox testified that during the interview at the ATF office, Mr. Carranza confirmed that

9    he purchased the firearms on May 16, 2010 from "The Gun Store."  He also told the agents that he

10   purchased more guns on May 17, 2010.  Mr. Carranza stated that the firearms were in Los Angeles,

11   California.  The agents confronted Mr. Carranza regarding this statement by stating that the

12   firearms were illegal in California and that it was unlikely that Mr. Carranza took them to

13   California for safekeeping.  Mr. Carranza admitted that the guns were no longer in California.  He

14   stated that he had "turned them over" and that he did not know where they were.  Mr. Carranza also

15   stated that he received $5,000 for purchasing the guns.  Mr. Carranza was reluctant during the

16   interview to implicate himself or Mr. Herrera in illegal firearms purchases.  He eventually

17   acknowledged that he either borrowed or received the money from Mr. Herrera to purchase the

18   firearms.  Mr. Carranza was confronted with his answer to question 11.a on the ATF Form 4473

19   and he admitted that he should have answered that question "no."

20        Detective Lutjens testified that Mr. Herrera did not tell the officers that he was currently

21   working as an informant for Agent Quigley or any other law enforcement agency.  Mr. Herrera

22   never admitted at any time that he was working as a government informant in regard to the

23   purchase of firearms by Mr. Carranza.  To the contrary, Mr. Herrera told the agents that Mr.

24   Carranza, to whom he was related through marriage, had invited him to go with him to the Las

25   Vegas Gun Range on May 22, 2010, but that he was not involved in Mr. Carranza's purchase of

26   firearms.  Agent Fox also testified that Mr. Herrera did not at any time state that he was working as

27   a government informant or agent in regard to the firearms transactions involving Mr. Carranza.

28   . . .

1    On cross-examination, Agent Fox testified that during the interview at the ATF office on

2  May 22, 2010, Mr. Herrera told the officers that he had information about someone moving

3  firearms from California to Mexico.  Agent Fox was asked whether Mr. Herrera had stated during

4  the interview that Agent Quigley had set him up with the individual who was trafficking guns

5  between California and Mexico.  Agent Fox testified that he understood Mr. Herrera to state that

6  Agent Quigley had referred him to a law enforcement officer in San Diego, California, ATF Agent

7  Matt Beal, who, in turn, was going to use Mr. Herrera as an undercover informant in a firearms

8  transaction.  Defendant's counsel introduced the portion of the video recording of Mr. Herrera's

9  interview regarding this statement.  *Defendant Exhibit 9A.*  Having reviewed the recording, the

10  Court finds Mr. Herrera's statement could be construed either way.

11    Agent Fox also testified that after Mr. Herrera told them about the other firearms

12  investigation, he checked with Agent Quigley who told Agent Fox that he had placed Mr. Herrera

13  in contact with Agent Beal.  It was Agent Fox's understanding that the ATF agent in San Diego

14  may have used Mr. Herrera in some capacity as an informant, but Agent Fox does not believe that

15  the ATF or law enforcement officers would use Mr. Herrera to move weapons into Mexico.  Agent

16  Fox testified that he asked Mr. Herrera during the May 22nd interview if he could set Agent Fox up

17  with the person that Mr. Herrera stated was moving guns to Mexico.  He testified the purpose for

18  this inquiry was to arrest the person or persons that Mr. Herrera indicated were trafficking guns to

19  Mexico.

20    Agent Fox testified that he later spoke with ATF Agent Matt Beal.  Agent Beal told him

21  that Mr. Herrera had been signed up or was in the process of being signed up as an informant for

22  the ATF.  Agent Beal stated, however, that Mr. Herrera was not working as an informant for him in

23  May 2010 and had never worked for him.  Agent Beal also told Agent Fox that Mr. Herrera had

24  been deactivated as an informant because of his activities in Nevada.

25    Agent Fox testified that neither Mr. Carranza nor Mr. Herrera were arrested following their

26  interviews at the ATF office on May 22, 2010.  After May 22, 2010, Mr. Herrera changed his

27  phone number and Agent Fox was unable to contact or locate him.  Agent Fox subsequently

28  attempted to obtain Mr. Carranza's assistance in locating Mr. Herrera, but Mr. Carranza could not

1    or would not assist Agent Fox.  Agent Fox testified that he believes ICE Agent Quigley was in

2    contact with Mr. Herrera after May 22, 2010.  Agent Fox has had no contact with Mr. Herrera since

3    May 22, 2010.  Defendant Carranza was arrested after the return of the indictment in this case.

4    **DISCUSSION**

5    **1.     Whether the Officers Had Reasonable Suspicion of Criminal Activity to Detain**
     **Defendant Carranza on May 22, 2010.**

6

7         The right to be secure from unreasonable searches and seizures under the Fourth

8    Amendment includes seizures that involve only a brief detention short of traditional arrest.  *United*

9    *States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007), citing *United States v. Brignoni-*

10   *Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).  The Government does not

11   dispute that Agent Fox and Detective Lutjens detained Mr. Carranza on May 22, 2010.  Agent Fox

12   used his vehicle to block Mr. Carranza's vehicle from leaving the parking lot.  The officers then

13   requested Mr. Carranza and the other individuals to exit their vehicle and the officers immediately

14   conducted a pat-down search of their persons for weapons.  Although the officers' show of

15   authority was relatively modest, it clearly did impede Mr. Carranza's freedom of movement.  The

16   Court therefore concludes that a seizure occurred within the meaning of the Fourth Amendment.

17   *See United States v. Smith*, 633 F.3d 889, 892-93 (9th Cir. 2011) and *California v. Hodari D.*, 499

18   U.S. 621, 626, 111 S.Ct. 1547 (1991).

19        The Defendant argues that Agent Fox and Detective Lutjens lacked reasonable suspicion of

20   criminal activity to detain him and therefore the evidence obtained as a result of the seizure should

21   be suppressed.  "An investigatory stop does not violate the Fourth Amendment 'if the officer has a

22   reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United*

23   *States v. Palos-Marquez*, 591 F.3d 1272,1274 (9th Cir. 2010), quoting *United States v. Sokolow*,

24   490 U.S. 1, 7, 109 S.Ct. 1581, 1585 (1989).

25        The Supreme Court further stated in *Sokolow*:

26            The Fourth Amendment requires "some minimum level of objective
              justification" for making the stop.  (citation omitted) That level of
27            suspicion is considerably less than proof of wrongdoing by a
              preponderance of the evidence.  We have held that probable cause
28            means "a fair probability that contraband or evidence of a crime will

14

1   be found," *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332,
2   76 L.Ed.2d 527 (1983), and the level of suspicion required for a
    *Terry* stop is obviously less demanding than that for probable cause,
3   see *United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 544,
    105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985).

4   490 U.S. at 7, 109 S.Ct. at 1585.

5       Reasonable suspicion exists if, in light of the totality of the circumstance, the officer has a

6   particularized and objective basis for suspecting that the person is engaged in criminal activity.

7   *United States v. Palos-Marquez*, 591 F.3d at 1274-75; *United States v. Berber-Tinoco*, 510 F.3d at

8   1087.  The circumstances include the officer's objective observations, information from police

9   reports, and the consideration of the modes or patterns of operation of certain kinds of lawbreakers.

10   *Berber-Tinoco*, at 1087, quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690 (1980).

11   In analyzing the objective data that may be relied on by the officers, the court in *Berber-Tinoco*

12   states:

13       Often, the data in the record seems equally capable of supporting an
         innocent explanation as a reasonable suspicion.  In such cases, the
14       Supreme Court directs us to give due weight to the factual inferences
         drawn by law enforcement officers, *United States v. Arvizu*, 534 U.S.
15       266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), and has noted that
         officers may make reasonable deductions and inferences based on
16       their experience and specialized training that "might well elude an
         untrained person." *Id.* at 273, 122 S.Ct. 744 (internal quotation
17       marks omitted).  In this vein, the Court has emphasized that even
         when factors considered in isolation from each other are susceptible
18       to an innocent explanation, they may collectively amount to a
         reasonable suspicion. *Id.* at 274, 122 S.Ct. 744.  Of course, officers
19       cannot rely solely on factors that would apply to many law-abiding
         citizens. *See, e.g.*, *United States v. Diaz–Juarez*, 299 F.3d 1138,
20       1141 (9th Cir.2002) ("Reasonable suspicion may not be based on
         broad profiles which cast suspicion on entire categories of people
21       without any individualized suspicion of the particular person to be
         stopped.") (internal quotation marks omitted); *United States v.
22       Sigmond–Ballesteros*, 285 F.3d 1117, 1127 (9th Cir.2002) (holding
         that there was no reasonable suspicion where the factors underlying
23       the suspicion depicted "'a very large category of presumably innocent
         travelers, who would be subject to virtually random seizures were the
24       Court to conclude that as little foundation as there was in this case
         could justify a seizure'") (quoting *Reid v. Georgia*, 448 U.S. 438,
25       441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980)).  However, the Supreme
         Court prohibits courts from adopting a "divide-and-conquer analysis"
26       by looking at each factor in isolation and according it no weight if it
         is susceptible to an innocent explanation. *Arvizu*, 534 U.S. at 274,
27       122 S.Ct. 744.

28   *Id.* at 510 F.3d at 1087-88.

15

The most compelling objective evidence supporting a finding of reasonable suspicion in this case was Mr. Carranza's cash purchase of eleven assault rifles within a period of six days, plus his inquiry about purchasing a $10,000 sniper rifle. Agent Fox received information on May 17, 2010 that Defendant Carranza had purchased eight assault rifles on the preceding day. As a group, the rifles consisted of only two calibers. Five of the rifles were Century Arms "AK-47" type rifles. Based on his training and experience, Agent Fox believed that none of the eight rifles were items that a gun collector would likely purchase for his collection. He also knew, however, that assault style rifles are in high demand by drug trafficking organizations in Mexico and also by persons in California where the sale of assault style rifles is prohibited.

Defendant paid for the rifles in cash, mostly in twenty dollar bills, which Agent Fox also recognized as consistent with an illegal "straw purchase" transaction. Based on the limited information regarding Defendant's place of residence, Agent Fox believed it was doubtful that Defendant would have $6,000 in cash to expend on personal gun purchases. Agent Fox was also informed that Defendant had returned to "The Gun Store" on May 17, 2010, during which he inquired about purchasing a $10,000 sniper rifle which is also in high demand by Mexican drug traffickers. During this inquiry, Defendant was talking on a cell phone to another person and then abruptly left the store. Agent Fox testified that this conduct was consistent with a straw purchase in which the individual purchasing the firearm is receiving direction from the actual buyer. "The Gun Store" employees also stated that Defendant did not appear to know much about firearms, which suggested that he was acting at someone else's direction. Agent Fox was thereafter notified on May 22, 2010 that Defendant Carranza was in the process of purchasing three more assault rifles at the Las Vegas Gun Range. The store owner or manager informed Agent Fox by telephone that Mr. Carranza was paying in cash, that one of the assault rifles was a Century Arms rifle, and that Defendant was accompanied by two other individuals.

The other circumstances relied on by Agent Fox–no record of prior handgun registrations in Mr. Carranza's name, Mr. Carranza's crossing of the United States-Mexico border on March 15 and 17, 2010, and the Agent's mistaken belief that Defendant Carranza had both a Nevada and California driver's license–did not, in and of themselves, indicate criminal activity. They are

1   relevant only to the extent that they provided additional support to the suspicions arising from Mr.

2   Carranza's firearms purchases.[3]

3        The possibility that Mr. Carranza might have been able to provide a lawful reason for

4   purchasing the assault rifles did not defeat the officers' reasonable suspicions that he was engaged

5   in illegal firearms trafficking.  As the Supreme Court stated in *United States v. Sokolow*, reasonable

6   suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence."

7   Based on the totality of circumstances, Agent Fox and Detective Lutjens clearly had reasonable

8   suspicion that Defendant Carranza was engaged in illegal firearms trafficking and therefore had

9   lawful grounds to detain and question him about those purchases.  Because the officers lawfully

10  detained Defendant Carranza, it is not necessary to address Defendant's argument that the giving of

11  *Miranda* warnings did not purge the taint of the allegedly illegal seizure.

12        **2.      Validity of Defendant's Consent to Search.**

13        Defendant has not challenged the validity of his consent to search his vehicle, except to the

14  extent that it was the product of an illegal seizure.  As stated above, the seizure was not illegal.

15  Based on the testimony of Agent Fox and Detective Lutjens, the Court also finds that Defendant's

16  consent to the search was voluntary.

17        Voluntariness is a question of fact to be determined from all the circumstances.  *United*

18  *States v.* Cormier, 220 F.3d 1103, 1112 (9th Cir. 2000), citing *United States v. Torres-Sanchez*, 83

19  F.3d 1123, 1129-30 (9th Cir. 1996).  The court considers the following five factors in determining

20  whether a person has freely consented to a search:  (1) whether the defendant was in custody; (2)

21  whether the officers had their guns drawn; (3) whether Miranda warnings had been given; (4)

22  whether the defendant was told he has a right not to consent; and (5) whether the defendant was

23  _____

24        [3] Mr. Carranza's purchase of eleven assault rifles in such a short time frame distinguishes

25  this case from *United States v. Santiago-Garcia*, 655 F.Supp.2d 1031 (D.Ariz. 2009).  The
    defendant in that case purchased an unstated amount of ammunition at a gun show on a single

26  occasion.  The officers' primary reason for detaining defendant was that he was Hispanic and
    therefore might be an illegal alien.  The court held that the other factors cited by the officers to

27  support their suspicions involved conduct that any lawful purchaser of ammunition at a gun show

28  might have engaged in.

17

1    told a search warrant could be obtained. *Id.* Prior to being requested to give consent, Defendant

2    Carranza was told that he was not under arrest or in custody. The officers did not draw their guns

3    at any time. Mr. Carranza was also advised of his *Miranda* rights. Although the giving of *Miranda*

4    rights can also indicate that the individual is in custody, Mr. Carranza and the other individuals

5    were told that they were not under arrest or in custody. Detective Lutjens testified that he asked

6    Mr. Carranza to sign the consent to search form of "his own free will." The consent to search form

7    signed by Mr. Carranza stated that he had been informed of his right not to consent. There is no

8    evidence that the officers made any statement about obtaining a search warrant. Based on these

9    circumstances, Mr. Carranza's consent to search his vehicle was voluntary and validly obtained.

10    **3.    Defendant's Request for Information/Testimony Relating to Mr. Herrera's Status or Role as a Government Informant.**

11

12    Prior to the evidentiary hearing on the motion to suppress, Defendant filed a motion

13    requesting that the Government be ordered to produce all information pertaining to Mr. Herrera's

14    immigration status, his special parole visa, and his work for the Government in return for

15    consideration relating to his immigration status. Defendant also requested that the Government be

16    ordered to produce all information in any government agency's possession pertaining to all prior

17    cases which Mr. Herrera worked as a government informant. *Defendant's Motion to Compel*

18    *Discovery Pursuant to Brady and the Sixth Amendment (#24), pages 5-6.* Defendant also served a

19    subpoena on ICE Agent Patrick Quigley requiring him appear as a witness at the evidentiary

20    hearing.[4]

21    In response to Defendant's motion to compel discovery, the Government represented that

22    Mr. Herrera was not working as a confidential informant in this case and that the agents were

23    unaware of his status as a confidential informant until after they made contact with him on May 22,

24    2010. The Government represented that Mr. Herrera's activities as a confidential informant were

25    not related to this case. The Government also filed a motion to quash the subpoena served on

26

27    _____

28    [4] During the evidentiary hearing, Defendant's counsel also argued that the Government should be required to produce ATF Agent Matt Beal for testimony at the hearing.

1   Agent Quigley on the ground that his testimony is irrelevant to the motion to suppress and on the

2   grounds that Agent Quigley, who currently resides in Michigan, is still recovering from serious

3   injuries he sustained in a motorcycle accident and is unable to travel by airplane.  *See*

4   *Government's Motion to Quash Subpoena (#30).*

5          The Court decided to proceed with the evidentiary hearing on the motion to suppress before

6   deciding whether information regarding Mr. Herrera's role as a government information or

7   testimony by Agent Quigley and/or Agent Beal is relevant to a decision on this motion.  As

8   discussed above, Agent Fox testified that Mr. Carranza first came to his attention through the

9   telephone call he received from "The Gun Store" on May 17, 2010 informing him of Mr.

10  Carranza's purchase of eight assault rifles.  There is no testimony or other evidence that Agent Fox

11  or Detective Lutjens received any information about Mr. Carranza from any other law enforcement

12  officer or agency, including ICE or any other ATF office.  Agent Fox and Detective Lutjens

13  testified that they had no knowledge of who Mr. Herrera was until they encountered him at the Las

14  Vegas Gun Range on May 22, 2010.  This did not occur until after the officers had detained the

15  three individuals.  The officers also did not learn of Mr. Herrera's true identity and status as a

16  government informant until after he first provided a false name to them.  Although Mr. Herrera

17  disclosed his status as a government informant, he told Agent Fox and Detective Lutjens that he

18  had simply accompanied Mr. Carranza to the Las Vegas Gun Range, but was not otherwise

19  involved in his firearms purchases.  He did not make any statement that he was working as a

20  confidential government informant in regard to Mr. Carranza or his firearms purchases.

21         The Court finds that Agent Fox's and Detective Lutjens' testimony is credible and that Mr.

22  Herrera's status or role as a government informant played no part in their investigation of Mr.

23  Carranza and the decision to detain him on May 22, 2010.  Therefore, information regarding Mr.

24  Herrera's activities as a government informant and/or testimony by Agents Quigley and Beal

25  regarding Mr. Herrera is not relevant to the Court's decision on Defendant's Motion to Suppress

26

27

28

for Fourth Amendment Violation (#19).[5]

## CONCLUSION

Based on the testimony of Agent Fox and Detective Lutjens, the Court concludes that the officers had reasonable suspicion that Defendant Carranza was engaging in illegal firearms transactions and therefore had lawful grounds to detain and question him about those suspicions. The Court also concludes that Mr. Carranza was not arrested or taken into custody on May 22, 2010, that he voluntarily consented to the search of his vehicle and that he voluntarily agreed to speak with the agents after being informed of his *Miranda* rights.  Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Suppress for Fourth Amendment Violation (#19) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 5th day of August, 2011.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge

---

[5] Information regarding Mr. Herrera's status and conduct as a government informant could be relevant and material to an entrapment defense at the time of trial.  The Court will address that issue in a separate order regarding *Defendant's Motion to Compel Discovery (#24).*